Per Curiam.

The appellant makes the following assignment of errors:
1. “The trial court erred in charging the jury on the subject of the testamentary capacity of the testator, there being no testimony or other evidence of testator’s incapacity.”
2. “The trial court erred in charging the jury by misquot *500 ing the law of Ohio, to-wit: Ohio Revised Code Sec. 2107.02, with regard to who may make a will.”
3. “The trial court erred in charging the jury that undue influence and mental capacity ‘are not separate questions, that you decide independent of each other. They are so interrelated that your determination of them may require you to consider them somewhat together *•* V ”
4. “The trial court erred in charging the jury that a preponderance of the evidence is evidence ‘which has a more convincing power upon your mind, not necessarily evidence offered by the plaintiffs against that offered by the defendants # * V ”
5. “The trial court erred in charging the jury to pay particular attention to the testimony of defendant-appellant.”
6. “The trial court erred in charging the jury on the subject of how the testator’s estate would be disposed of had she died without a will, which instruction opened the door for the jury to rewrite the decedent’s will.”
7. “The trial court erred in refusing the defendant the right to open and close the evidence and argument as required by law.”
8. “The trial court erred in admitting hearsay evidence over the objection of the defendant.”
9. “The trial court erred in admitting into evidence the Probate Court records of the testator’s deceased husband who had died prior to the decedent’s making a will. ’ ’
10. ‘ ‘ The Court of Appeals erred in affirming the trial court as the judgment was against the manifest weight of evidence there being insufficient evidence to sustain a verdict for the plaintiffs.”
The court has examined the entire record in this case with great care. Error was committed in the trial of the case. The appellees contend that many of the errors assigned in this court were not assigned as errors in the Court of Appéals, and that other errors assigned in this court were waived at trial in the Common Pleas Court.
The tenth assigned error-, “there being insufficient evidence to sustain a verdict for the plaintiffs,” was assigned in the Court of Appeals and is assigned here. The court will examine this first.
*501 There is no testimony or other evidence of lack of testamentary capacity in the record.
If the judgment invalidating the will and codicil is to be sustained on this record, it must be done upon the ground of undue influence or restraint.
“* * * undue influence invalidating a will is that which substitutes the wishes of another for those of the testator. * * * It must be such as to control the mental operations of the testator in the making of his will, overcome his power of resistance, and oblige, him to make a disposition of his property which he would not have made if left to act freely according to his own wishes and pleasure.” 57 American Jurisprudence, 258, 259, Wills, Sections 350 and 351.
Similarly, “undue influence to avoid a will must so overpower and subjugate the mind of the testator as to destroy his free agency and make him express the will of another rather than his own, and the mere presence of influence is not sufficient. Undue influence must be present or operative at the time of the execution of the will resulting in dispositions which the testator would not otherwise have made.” 94 Corpus Juris Secundum, 1064, Section 224.
G-eneral influence, however strong or controlling, is not undue influence unless brought to bear directly upon the act of making the will. If the will or codicil, as finally executed, expresses the will, toishes and desires of the testator, the will is not void because of undue influence.
The essential elements of undue influence are a susceptible testator, another’s opportunity to exert it, the fact of improper influence exerted or attempted, and the result showing the effect of such influence.
The mere existence of undue influence, or an opportunity to exercise it, although coupled with an interest or motive to do so, is not sufficient, but such influence must be actually exerted on the mind of the testator with respect to the execution of the will in question. It must be shown that such influence, whether exerted at the time of the making of the loitt or prior thereto, was operative at the time of its execution, or was directly connected therewith. It must be shown that undue influence was exercised with the object of procuring a will in favor of particular parties.
*502 It is well stated, as follows, in. 94 Corpus Juris Secundum, 1074, Section 224:
“The fact that the will of the testator of admitted testamentary capacity disposes of his property in an unnatural manner, unjustly, or unequally, and however much at vaiiance with expressions by the testator concerning relatives or the natural objects of his bounty, does not invalidate the will, unless undue influence was actually exercised on the testator.”
The general rule established by the overwhelming weight of authority, and followed by the Ohio courts, is that declarations of the testator not made contemporaneously with the execution of the will or so near thereto as to constitute a part of the res gestae are not admissible as substantive proof of the fact of undue influence. Annotation, 79 A. L. R., 1449; Van Demark v. Tompkins, Exr., 121 Ohio St., 129, 167 N. E., 370.
Section 2741.05, Revised Code, which provides that “on the trial of the issue made up as provided in Section 2741.04 of the Revised Code, the order of probate is prima facie evidence of the attestation, execution, and validity of the will or codicil,” places the burden of proof upon the contestants. Banning v. Banning, 12 Ohio St., 437; Mears v. Mears, 15 Ohio St., 90; Converse v. Starr, Admr., 23 Ohio St., 491; Kennedy, Exr., v. Walcutt, 118 Ohio St., 442, 161 N. E., 336.
A presumption arises from the order of admission of the will to probate that the testator was free from restraint. The burden of proving undue influence is upon the contestants, under Section 2741.05, Revised Code.
The plaintiffs called eight witnesses. Of these eight, five witnesses, Mrs. Hackney, the deputy clerk of the Probate Court, Forrest Walraven, husband of June West Walraven and son-in-law of Mrs. Eva West, one of the contestants, Evelyn West Vandervort, Mrs. Eva West, daughter of the testatrix, and Mrs. Bertha Brinson, friend of Mrs. Faye Davis, gave no testimony which was in any way related, directly or indirectly, to the question of undue influence or restraint.
The entire record in this case, including all the testimony and other evidence, has been examined with great care. The contestants rely almost exclusively upon testimony concerning declarations made by the testatrix. There is no evidence in this record of undue influence or restraint upon the testatrix. The *503 only testimony as to matters that were contemporaneous with the execution of the will or near in time thereto is the testimony of June West Walraven, a granddaughter of the testatrix, which is as follows:
“Q. September 19, 1958, is the date upon which the codicil to the will was drawn. My question was, did you have occasion to take her any place and if so, at what time and where did you take her?. A. Yes, she called me that morning and said, ‘June, will you come over and take me downtown. I will tell you what I have to do, or go for, but not over the telephone.’ I said, ‘Sure, I will be right over,’ and I ran over then and picked her up. She came out the door of the house, and she seemed upset, and I just thought she seemed more so than usual. She said, ‘I want you to take me to the bank, I want to change my will,’ and then she said, ‘I don’t want them to know about it,’ By ‘them,’ I suppose she meant Roy and Mable . . .
“Mr. Hart: Objection.
“The Court: Just what she said, not supposition. Sustained.
“A. Well, she said, ‘I don’t want them to know about it,’ that’s what she said.
‘ ‘ Q. Did she make any motion with her hand when she said that? A. We were riding up Wood Street, and she said ‘them’ and pointed her hand.
“Q. Where did she point? Behind her, or where? A. We were going up the hill above that was where they live, so I know that is right, that’s who she meant.
“Q. What did she say, precisely? A. She said, ‘I am going to the bank, going to change my will and I don’t want them to know about it. ’
“Q. What happened after that? A. I let her out at the bank and said, ‘Do you want me to wait for you?,’ and she said ‘No,’ that it was a pretty day and she would walk home, and thanked me and that was it.
“Q. You say this particular day she seemed nervous, apprehensive and upset? A. Yes, I thought it was because she was going to do something very important, that was my impression, it was the only will she had and it was a big thing in her life, and was going to make it.
“ Q. Up till then, you were or were not aware that she had *504 a will? A. No, I was not aware she had one, and when she said ‘change,’ I thought it was just that she was confused.
“Mr. Hart: Objection.
‘ ‘ The Court: Sustained. ’ ’
Cross-examination by Mr. Hart:
“Q. And all your grandmother said was as you testified, is that right? A. Yes.
“Q. You allowed her to go home from the bank by herself? A. Yes, she walked home.
“Q. You felt she was able to go home by herself and knew what she was doing? A. Well, it was a pretty day and she said, ‘I will walk home,’ and so my grandmother just walked home. That was the way she was.
“Q. Another, rather, besides making the remark, ‘I don’t want them to know about it,’ that was all she said about any will? A. That’s right, and — but that is supposition, so never mind. ’ ’
“D. K. Hempstead testified as follows:
“Q. In the course of your duties as trust officer of the Clinton County National Bank & Trust Company, did you have any occasion to consult with Mrs. G-usta Henry? A. Yes, she called me up, as I recall, she called me one day and said she would like to come in and discuss a will that she wanted to make some changes, and wanted to name the bank as executor.
“Q. You, did you make an appointment for such purpose with Mrs. Henry? A. Yes, we did.
‘ ‘ Q. How long prior to the actual appointment that you had with her did she make this call, if you will recall? A. As I recall, she made one appointment and wasn’t able to come, I.think, and I made a second appointment and she did come.
“Q. The call and the appointment were within what period of time, that is, from one to the other? A. Comparatively short period of time.
“Q. "Would you say it was a period of days or week? A. I don’t actually remember. I would guess a week or two, maybe. I am not certain.
“Q. Did she request you to obtain the services of an attorney to meet with you at that time? A. Yes, in fact, I asked who her attorney was at that time, and she said she wanted Fred Buckley to draw her will, so I contacted Mr, Buckley.
*505 ‘ ‘ Q. Do you know whether she had contacted him previously to your contacting him? A. I think- she did, but I couldn’t say.
“Q. You did then, meet with Mr. Buckley and Mrs. Henry? A. Yes.
“Q. When did this meeting take place, if you remember? A. She came to the bank, as I recall, I had notified Mr. Buckley she was coming in on a certain day, and she arrived somewhat early as I recall, and I called Mr. Buckley and he came to the office. •
“Q. Were any members of her family present at that time? A. No.
££Q. Do you know whether or not that she asked that members of her family not be informed of this meeting? A. As a matter of fact, I don’t think she said anything about it. I do remember this, I think it was the first time she called, I offered to go to the house and she said ‘No,’ that she would come to the bank. I think .that was all she said.
“Q. Did she say why she preferred coming to the bank? A. No.
“Q. Mr. Hempstead, would you describe to this court and jury, the observations which you made of Mrs. Henry at the time of your meeting with Mr. Buckley at the bank? A. Well, she apparently knew what she wanted to do. She was somewhat nervous and she had indicated, as I said, that she wanted the bank to be named executor and wanted to make some changes in the will, and then she decided she would leave Roy Henry in as executor instead of the bank and did, and use the bank, use us, as secondary executor to function in the case he was deceased.
“Q. Did you discuss these changes with her? A. Yes, right in my office.
“Q. Was Mr. Buckley present during these discussions? A. Yes he was.
“Q. What, if anything, occurred in order to accomplish these changes? A. Well, she merely told us what changes were wanted made by her, primarily, as I recall, she wanted to make disposition of certain personal effects to some other members of the family. As I recall, she left the real estate to Roy Henry and wished to dispose of personal effects to some other members of the family.
*506 “Q. Was a codicil prepared at this time? A. Seems to me as though it was a new will, although I couldn’t say for sure. She executed a new will.
“Q. Was that done during this meeting? A. Mr. Buckley made notes of what she wanted. She apparently had in mind pretty much of what she wanted done, and I think he then went to his office and typed up the will and returned with it, the way I remember it.
“Q. Was this executed the same morning as your original meeting with Mrs. Henry? A. I think it was.
“Q. You stated that Mrs. Henry appeared nervous, Mr. Hempstead. How did she manifest this nervousness according to your recollection? A. Well, she apparently seemed to know what she wanted to do, but at the same time she seemed a little frustrated. Might have been partly due to the fact she was not very well. That was one reason I suggested that I would come to the house, if she wanted me to, but she just seemed rather emotionally upset I would say, although apparently she had in mind pretty much what she wanted to do.
“Q. Did she have her mind pretty well made up as to what she wanted to do at the time she came to the bank, or seem to reach these decisions after the discussion with you and Mr. Buckley? A. As I recall, she had her mind already set on what she wanted to do.
“Q. Her mind was already set? A. As I recall, yes.
“Q. Well, at the time of her original call to you, Mr. Hempstead, Mrs. Henry did indicate some of the changes she intended to make in her will, isn’t that true? A. The first time she called me?
“Q. Yes, A. The way I remember it, as a matter of fact, I am somewhat hazy on it, but the way I remember it, she called and made an appointment and for some reason was unable to come in, then made subsequent appointment and she did come and that was the time I got in touch with Mr. Buckley and he came over.
“Q. She did, however, indicate at least one of the changes she wanted the bank to act as executor? A. Yes, she indicated that the first time she called me about making changes in the will and naming the bank as executor.
*507 “Q. As a matter of fact, when you met for the purpose of your conference on the 19th of September, she, in the meantime had changed her mind? A. She apparently had. I was somewhat surprised because she had indicated what she had wanted, then retained Roy Henry as executor, although she did name the bank to serve in the case he should predecease her.
‘ ‘ Mr. Dennis: Yon may cross-examine. ’ ’
Cross-examination by Mr. Hart:
“Q. Mr. Hempstead, did Mrs. Henry know the extent of her family relationship with all her relatives that day? A. I think she did.
“Q. Did she know what property she owned at that time? A. I would think so.
“Q. Did she set forth in this codicil, certain items she wanted to be given to certain people? A. Yes.
‘ ‘ Q. Did she indicate to you any reason why she might have been upset that morning? A. No, she did not.
££Q. Did you advise against her making this instrument that morning? A. No.”
Redirect examination by Mr. Buckley:
£<Q. Mr. Hempstead, you indicated on direct examination, that Mrs. Henry had asked you specifically not to come to the house? A. That is correct.
££Q. Did she later indicate why or for what reason? A. No, she suggested I not come to the house, or not call her up, that she would contact me.
££Q. And did she explain or intimate any reason for that? A. Well, I think she wanted this to be strictly private, I can’t say.
££Q. Would you characterize the whole transaction as somewhat secretive? A. Somewhat, yes.
££Q. Thank you sir. That is all.”
It is clear from this testimony that there is no evidence here of undue influence or restraint sufficient to support a verdict setting aside the will.
The only other testimony in this record which could be said to even remotely relate to the question of undue influence or restraint is that of Mrs. Faye Davis, daughter of the testatrix, which is as follows:
This testimony refers to the settlement of the father’s *508 estate which occurred some years prior to the death of the mother, the testatrix.
“Q. What, if you know, was done with reference to settlement between you and Roy and the others? A. Mother wanted to settle it, I guess, right away. I went back home to Fayetteville and when I left they seemed to have gone in and changed her, because she was entirely changed. She had changed everything she had asked. She had been influenced by the other, the rest of the family ...
“Mr. Hart: Objection — to the line of questioning.
“The Court: That is a question for the jury as to whether or not she was influenced.
(. C * # *
“Q. Was any change made in their living arrangements, and why, if you know? A. Well, after I had gone home, I had been here twice, and after I had gone home someone, I think, talked her into selling that house .■. .
“Mr. Hart: Objection.
“The Court: Sustained.
“* * * [The following testimony refers to a conversation which occurred at the time the testatrix visited the witness, her daughter, in North Carolina.]
“Q. What was the subject — what would she say? A. Many times she would say ‘It’s time for me to go home, I’ve got things to do, must change things and make it right before it’s too late,’ things like that in her talk. At the time, of course, it didn’t dawn on me what she was trying to tell me, but after this was all brought out, I know now . . .
“Mr. Hart: I object to anything after ‘this has been brought out.’
“Q. What statement did she make? A. Well, one time stands out plainly to me, she asked me if I had ever signed anything that I didn’t know what I had signed. I said, ‘Oh, I don’t know, I might have,’ and she said, ‘Well, I have.’ I said, ‘Mother, why would you sign something you didn’t know what you were signing?’ She hesitated, and her eyes filled up and she seemed to start to cry, and I said, ‘What was wrong, why did you do it?,’ and she said ‘Either do it or not have anything to live on. ’
“* * * [The following testimony refers to a conversation *509 between the witness, daughter of the testatrix, and her sister-in-law and brother in Wilmington prior to the death of the testatrix.]
“Q. What were the circumstances of them telling you? A. I was down in the back of the house, trying to close the garage door and they came over and started talking, and Mabel asked me how Mother acted that winter and I said fine, that she seemed to enjoy her time that winter more than any time since Dad had been gone. Then Mabel said, did you know she got June to take her up to change her will, and I said no, and she said ‘Well, she did, she called June and asked her to take her up to the bank to change her will.’ I said I didn’t know what it was all about and Mabel said, of her own free will, ‘Now we don’t know what is in it.’ I just looked at her funny, and then she said, ‘Of course, we didn’t know anyway,’ then she said Mother was going to change the will and make the bank administrator. If she didn’t know what was in the will, why did she say that?
“Mr. Hart: Object to the last remark.
“The Court: Jury will disregard the last remark.
i ( # # #
“Q. What if anything did Roy say or do on that occasion? A. He said that Mother had gotten so changeable. First she wanted one thing, then another, ‘Now she wants to sell this house, all she has done is sell and move. I can’t please her. I don’t know what to do with her, she is too changeable for me.’ He went on saying things like that, doesn’t mean a lot, I guess . . .
“Q. This was the first time that you knew definitely there a will at all? A. Yes, for sure. She had mentioned ‘wills’ and when people were talking about things like that, and what to do, and just things like that, but never come right out and told me that she had a will.
“ * * * [The following testimony refers to conversations of the testatrix while visiting the witness, her daughter, in North Carolina.]
“Q. What comment, if any, did Mrs. Henry make? A. Well, she said to.the people several times about children — ‘all children are your children, and every parent would treat all *510 the children the same, ’ because we were talking about a family down there, not here ...
“Q. When did she make this statement that she felt she * had to go home to make changes? A. It seemed like the last two or three winters she would bring that up and start worrying and want to go home. She would say she had to go home, and I’d say why, and she’d always say, ‘I don’t know what I have done, but I have got to make some changes and make things right,’ I’d always turn the conversation and say ‘You haven’t done anything, stay another week or month,’ whatever it was.”
Neither this witness nor any other witness related this testimony or connected it up to undue influence or restraint bearing upon the execution of the will or the codicil in this case.
It should be noted that the codicil to the will, which is a part of the record in this case, was drafted by the attorney for the contestants, and this attorney was one of the subscribing witnesses.
According to the testimony of I). K. Hempstead, a local hanker and the other subscribing witness to the codicil, the testatrix called him and informed him that she wanted to change her will and asked him to call this attorney to draft the changes. Hempstead testified that this attorney came to the bank and the testatrix told him what changes she wanted the codicil to contain. He returned to his office and drafted the codicil and then returned to the bank where the testatrix signed the codicil, and Hempstead and the attorney witnessed this signing of the codicil by the testatrix. This attorney, who represents the contestants in this ease, did not attempt or offer to take the witness stand.
There is no evidence in this record, and certainly none that is contemporaneous with or near to the time of the making of the will or the codicil, of undue influence or restraint, nor any evidence from which an inference of undue influence or restraint could reasonably and lawfully be drawn.
It is, therefore, unnecessary for this court to examine or make a determination concerning the other errors assigned by the appellant.
It is the opinion of this court that:
1. In a will contest, the essential elements of undue influence are (1) a susceptible testator, (2) another’s opportunity *511 to exert it, (3) the fact of improper influence exerted or attempted and (4) the result showing the effect of such influence.
2. The mere existence of undue influence or an opportunity to exercise it, although coupled with an interest or motive to do so, is not sufficient to invalidate a will, but such influence must be actually exerted on the mind of the testator with respect to the execution of the will in question; and, in order to invalidate the will, it must be shown that the undue influence resulted in the making of testamentary dispositions which the testator would not otherwise have made.
3. A will or codicil which, as finally executed, expresses the will, wishes and desires of the testator is not void because of undue influence.
4. The fact that the will of a testator of admitted testamentary capacity disposes of his property in an unnatural manner, unjustly or unequally and however much at variance with the expressions by the testator concerning relatives or the natural objects of his bounty, does not invalidate the will unless undue influence was actually exercised on testator.
5. Declarations of a testator not made contemporaneously with the execution of the will or so near thereto as to constitute a part of the res gestae are not admissible as substantive proof of the fact of undue influence.
6. In a will contest, the order of probate is prima facie evidence of the attestation, execution and validity of the will or codicil and places the burden of proof upon the contestants.
The judgment of the Court of Appeals is reversed, and judgment is rendered for the appellant.

Judgment reversed.

Weygandt, C. J., Zimmerman, Taet, Matthias, Bell, Radcliee and O’Neill, JJ., concur.
Radcliee, J., of the Fourth Appellate District, sitting by designation in the place and stead of Herbert, J.